**Henry E. DOSS, Respondent,**

v.

**EPIC HEALTHCARE MANAGEMENT COMPANY, Appellant,**

v.

**BOATMEN'S BANK OF SOUTHERN MISSOURI, Respondent.**

Nos. 19595, 19566.

Missouri Court of Appeals,
Southern District.

April 27, 1995.

Motion for Rehearing and/or
Transfer Denied June 6, 1995.

Application to Transfer Denied
July 25, 1995.

Mary Johnson Tidholm, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Oklahoma City, OK, Rana L. Faaborg, Woolsey, Fisher, Whiteaker & McDonald, Springfield, for appellant.

Jim D. Loftis, James L. Menzer, Loftis & Menzer, P.A., Norman, OK, for respondent Henry E. Doss.

Mark E. Pfeiffer, Farrington & Curtis, P.C., Springfield, for respondent Boatmen's Bank, for respondent.

PER CURIAM.

Respondent Henry E. Doss sued as assignee of a lease of copy machines executed between Equity Rental Co. Inc. (also known and here referred to as "Copytech") as lessor and appellant EPIC Healthcare Management Co., as lessee. EPIC filed a third-party petition against respondent Boatmen's Bank of Southern Missouri, a prior assignee of the lease. The trial court sustained motions for summary judgment filed by Doss and Boatmen's, entering judgment for Doss in the amount of $19,250.24 principal, $7,723.52 interest, attorneys' fees of $8,901.34, and costs. The court also entered judgment in favor of Boatmen's, thus disposing of all issues. EPIC appeals. We conclude that the record does not demonstrate absence of genuine issues of fact, and therefore reverse and remand for further proceedings. We review the facts in the light most favorable to EPIC, as the party opposing summary judgment. *Zafft v. Eli Lilly & Co.,* 676 S.W.2d 241, 244[5] (Mo.banc 1984).

### 1. The Factual Setting

Under date of July 1, 1989, Copytech leased two copying machines to EPIC. Paragraph 13 of the lease embodied the clauses known as "waiver of defenses" and "hell or high water," reading as follows:

*"ASSIGNABILITY BY LESSOR.* Lessor may without the consent of the Lessee at any time and from time to time assign this Lease.... The assignee of any of Lessor's rights hereunder shall be under no obligation to perform any of Lessor's duties, obligations, covenants or agreements under this lease and such duties, obligations, covenants and agreements shall remain the full liability of Lessor. The rights of any such assignee in and to the rents and other sums payable by the Lessee under this Lease ... shall not be subject to any defense, setoff, counterclaim or recoupment, whether by reason of any defect in Lessor's title or any interruption from any cause in the use, operation or possession of the Equipment ... or by reason of any other indebtedness or liability however, and whenever arising of Lessor to Lessee or to any other person ..., or for any cause whatsoever, it being the intent hereof that Lessee shall be unconditionally and absolutely obligated to pay any such assignee hereof all of the rents and other sums provided for by this Lease and assigned to such assignee."

The lease also had a non-cancelable provision, and a "zipper" clause, providing that the lease constitutes "the entire agreement of the parties with respect to the subject matter ...," disclaiming warranties, and specifying that the lease may "only be modified, extended or renewed by a writing signed by the parties hereto."

The recitals in the lease notwithstanding, EPIC executed and delivered two additional documents under date of June 30, 1989. One was a purchase order, stating that the lease could be cancelled on thirty days' notice by either party. The second was a copier management program. Copytech also provided a letter dated June 30, 1989, in which it confirmed EPIC's right of cancellation on 30–day notice. Robert Koch, who acted for EPIC with relation to the lease transaction, stated in an affidavit that all of these documents were exchanged at the time the lease was signed.

In July or August of 1989, Copytech assigned the lease to Boatmen's. EPIC was paying the installments of rent regularly at the time of this assignment. Boatmen's officers denied knowledge of any agreement allowing EPIC to cancel the lease on 30 days' notice, and, as a matter of policy, Boatmen's would not have purchased a lease of personal property which was subject to cancellation. Boatmen's obtained a service contract for the copiers, with EPIC paying the charges. Following the assignment, payments were made to Boatmen's through October of 1990.

Koch complained to Ron Pender, an officer of Boatmen's, about service problems, and advised him that EPIC was going to cancel

the lease. On September 5, 1990, Koch wrote Pender as follows:

"Per the original terms of our agreement with Copytech stated on our Purchase Order #399444–442, as well as in the attached letter signed by Steve Moore, this letter will serve as our 30 days written notice to terminate our contract for copy machines.

"Please pick up the two Sharp 8100 model copiers at our back dock by 11–1–90, at which time we will cease our payments for these machines."

Pender made no response, oral or written. He executed an affidavit stating in pertinent part:

"Because Epic was refusing to make any further payments and because I did not want the copiers sitting on a loading dock, I instructed Boatmen's maintenance to pick up the copiers. Never once did I nor anyone else at Boatmen's, to my knowledge, ever communicate to Bob Koch or anyone else at Epic that Boatmen's would not pursue its rights under the terms of the Lease. Never once, to my knowledge, did any agent of Boatmen's tell Epic that Boatmen's agreed that Epic had the right to terminate the lease on 30 days written notice."

Beverly Kay Jones, another Boatmen's officer who was familiar with the transaction, gave a deposition. When asked whether she directed anybody at the bank to communicate with EPIC after receiving the September 5th letter, she responded as follows: "I don't know if I communicated with them or whether Ron Pender did, but one of our point people to ensure that machines were picked up was Ron Morgan."

When asked whether Morgan was instructed to communicate with EPIC or the hospital after Boatmen's received the letter she replied, "I would assume."

A Boatmen's representative picked up the machines on November 2, 1990, at EPIC's dock. Jones issued a cancellation order for the service contract. Boatmen's charged the transaction off on its books. Jones explained that the charge-off was customary as to transactions which were in default, so that

the books would not assign value to doubtful assets. The bank ceased sending notices of installments to EPIC, and made no attempt to collect further payments. In December of 1990 it leased the machines to another customer.

On March 1, 1991, Boatmen's assigned 129 leases of machines to Henry E. Doss. He paid a lump sum and did not compute the value of each individual item. His affidavit regarding the EPIC transaction reads as follows: "Prior to purchasing the lease, I was provided a copy of the file maintained by Boatmen's Bank of Southern Missouri with regard to the lease. In that file was a copy of the September 5, 1990, correspondence of Bob Koch, all three pages of which are attached hereto."

He then expressed the conclusion that EPIC's attempt to cancel the lease was legally ineffective. The record does not show whether he also received papers regarding the post-repossession leasing of the copiers as testified to by Jones, or whether he collected any payments from the new lessee. As part of the transaction, Boatmen's provided Doss a list of "nonperforming leases," which included the EPIC lease. Doss knew before he agreed to purchase the leases that the EPIC copiers had been picked up and were no longer in EPIC's possession.

On October 28, 1992, a lawyer for Doss wrote EPIC, demanding payment of installments through October 26, 1992, of $17,070.65, with interest. Doss then filed suit against EPIC, seeking recovery of lease installments after November of 1990. EPIC filed a third-party petition against Boatmen's, seeking indemnity and cost of defense, on several legal theories. The trial court entered summary judgment in favor of Doss and Boatmen's, and against EPIC, as has been said.

### 2. Unilateral Contract or Waiver?

■ EPIC does not appear to argue that the cancellation provisions in the purchase order and the side agreement were binding on Boatmen's at the time of the assignment, and there is no occasion to determine whether the parol evidence rule would stand in the way of binding Copytech. EPIC rather

characterizes its letter of September 5, 1990, as an offer for a unilateral contract, and the pickup of the machines by Boatmen's on November 2, 1990, as the acceptance of that offer. It says that a court or jury could so find after hearing evidence. Therefore, there is a genuine issue of material fact as to whether the lease had been cancelled or rescinded.

█ The concept of "unilateral contract" is well established in the common law and in the law of Missouri. *Garrity v. A.I. Processors*, 850 S.W.2d 413 (Mo.App.1993). In a unilateral contract an offer is made which calls for acceptance by an act rather than by communication. In *Garrity* the issue was the place of making the contract, in which a Utah corporation transmitted an offer to sell a dryer from its Iowa office and called for acceptance by deposit of the purchase price in a bank in Utah. The court said that the contract was effected in Utah when the deposit was made.

█ There is no reason why a unilateral contract would not result if EPIC were to say to Boatmen's: "We propose to cancel our lease which you hold and to relinquish our rights in the copy machines. If you agree, pick the machines up after November 1," and Boatmen's then picked up the machines. There would be a legal detriment to EPIC in surrendering the machines, and a benefit to Boatmen's in obtaining possession of them free of the lease. The requirement of consideration would then be present, and the law does not concern itself with the adequacy of the consideration.

█ It might be argued that this scenario does not fit the present record. EPIC apparently assumed that it had a right to cancel the lease on 30 days' notice, and unequivocally asserted its intention to do so. It assumed that, once the notice was given, Boatmen's had no choice. We believe, however, that the contractual analogy is not inappropriate, so that the trier of fact could find a clear statement of position and an acceptance of that position. Resolution of the problem would depend on Boatmen's intentions at the time of making the pickup. Especially when unilateral contracts are involved, there may be a

question of fact as to whether particular conduct is intended as an acceptance. 2 Williston on Contracts § 6:4 (4th ed. 1991).

Boatmen's argues that in picking up the machines it was simply fulfilling its obligation to mitigate damages. It also argues that it was not obliged to give EPIC any notice of default as a condition of exercising its contractual remedies for default, citing § 400.2A–502, RSMo 1986. This is the explanation set out in Pender's affidavit. The affidavit, however, seems to be the product of a lawyer's careful craftsmanship, and the trier of fact might not be impressed by testimony which tracked the affidavit.

█ Intent is usually established by circumstantial evidence. There are circumstances in the record which might persuade the trier of the fact that Boatmen's accepted EPIC's proposal for a surrender of the lease by picking up the copiers. These include the picking up of the machines without asserting that EPIC was still obliged to make payments; the charge-off on the books; the cancellation of the service contract; the failure to send notices of installments; and the absolute failure of the bank, prior to the assignment to Doss, to make any effort to collect further installments, even though the bank's collection department is alerted by processing machinery when any obligation is more than 15 days past due. Pender's affidavit is not the kind of filing which requires explicit denial, because circumstantial evidence raises a question of credibility which cannot be resolved in summary judgment proceedings. A court or jury could find that Boatmen's actions constituted an agreement with EPIC that the lease was no longer a binding obligation.

Boatmen's argues that EPIC could not, by sending the September 5 letter, impose on Boatmen's a duty to respond. It is suggested, Restatement (Second) of Contracts § 283 (1979), that the failure to respond to an offer of rescission may, in light of surrounding circumstances, effect an acceptance. Here there are circumstances tending to show that both parties considered that the lease was at an end following the repossession. It is said in the same section that, in rescission of a contract, the element of consideration is

found in each party's surrender of its contract rights.

We reject Boatmen's other objections to the contract analysis. If the contract asserted by EPIC is established, it is not in any sense illusory because Boatmen's had no right to possession of the machines if EPIC chose to continue its performance. *Fenberg v. Goggin,* 800 S.W.2d 132 (Mo.App.1990), cited by Doss, is of no help. Nor is there anything indefinite or uncertain about what was proposed and how acceptance might be effected. *New Medico Associates, Inc. v. Snadon,* 855 S.W.2d 489 (Mo.App.1993) is not remotely in point.

Boatmen's also points to paragraph 4 of the lease, which provides that the lease may "only be modified, extended or renewed by a writing signed by the parties hereto." Our law has held that such provisions do not prevent the parties from effecting modifications by valid contractual formalities, even though there is no writing. *Fritts v. Cloud Oak Flooring Co.,* 478 S.W.2d 8 (Mo.App. 1972), citing 3A Corbin on Contracts, § 763, p. 531. The parties to a contract may agree between themselves that the contract is to be cancelled or rescinded, and the only formalities required are those ordinarily attending the making of contracts. The respondents mention § 400.2A–208, RSMo Supp.1993, which seems to establish a different rule for certain leases of personal property, but that section was not enacted until 1992. The new statute, furthermore, specifically states that an attempted oral modification "may operate as a waiver."

This brings us to EPIC's alternate argument that, by picking up the machines on November 2, 1990, Boatmen's waived further rights under the lease and agreed to termination. It is manifest that EPIC did not consider that it was defaulting. It thought that it had a legal right to terminate the lease on thirty days' notice, and sought to exercise that right, giving notice of the underlying rationale. Instead of immediately ceasing payments it gave the notice prescribed by the documents it relied on, and made additional payments. Boatmen's had adequate notice of EPIC's contentions.

Waiver is defined in *Black's Law Dictionary,* 5th Ed., as "The intentional or voluntary relinquishment of a known right." The trier of the fact might conclude that Boatmen's conduct after receiving the September 5 notice manifests acquiescence in EPIC's statement of its position, taken in reliance on the letter agreement with Copytech. It might have been willing to waive its rights for a number of reasons, such as the desire to maintain good will in the business community, a feeling that it should not depart from an agreement made by its assignor, or the belief that it would be more economic to lease the machines to another than to litigate. The value of the lease was inconsequential in the reference frame of Boatmen's total resources.

The doctrine of waiver is a part of Missouri law. *Herbert & Brooner Constr. Co. v. Golden,* 499 S.W.2d 541 (Mo.App.1973). The doctrine is contractual in nature, requiring a showing either of consideration or of detrimental reliance. Under the facts stated, the trier of the fact might find either. It is quite possible that, if EPIC had been timely advised of Boatmen's present position, it might have chosen to keep the copiers in preference to litigating. That Boatmen's gave no timely advice of its intention might be further indication of a purpose of waiving any claims for rent.

Under Boatmen's theory, the September 5 letter constituted an anticipatory breach of contract justifying it, without responding to the letter, in treating EPIC as a defaulter even though it made no effort to collect future installments up until the time it assigned the lease to Doss. It picked up the copiers as requested while at all times disagreeing with EPIC's assertion of a right to terminate, and now supports Doss's claim as assignee. The trier of fact might consider these protestations inconsistent with Boatmen's objective manifestations.

Thus, there is a question of fact as to Boatmen's intentions in picking up the copiers on November 2. The theories of unilateral contract and waiver are somewhat similar. Under both, EPIC asserted that it had a right, and Boatmen's proceeded in the manner it suggested. We are not saying

that EPIC's position is legally compelled, but simply that there is a genuine question of material fact so as to make summary judgment inappropriate. It would not be appropriate at this time to consider the findings which are necessary under the theories of contract and waiver, or to suggest instructions. EPIC apparently assumes that the issues are jury triable, but we make no determination as to the method of trial. The parties have not briefed the issues raised by EPIC in its third-party petition against the bank, and we leave these to further proceedings.

### 3. "Hell or High Water"

Doss argues that whatever might be determined as between EPIC and Boatmen's should not affect his claim against EPIC, arguing: (1) that he has the rights of a holder in due course as to the leases, (2) that he has the rights of a successor to a holder in due course under the "shelter rule," and (3) that the "hell or high water" clause of the lease protects his position against any defenses that EPIC might have as to Boatmen's.

 Under the normal rule of contract law an assignee "stands in the shoes" of the assignor, so that a defense valid against the latter is also effective against the former. There is a long-recognized exception in the law of negotiable instruments, codified in the NIL and, more recently, in Chapter 3 of the Uniform Commercial Code, Chapter 400, RSMo 1986 and supplements. Only one who acquires a negotiable instrument may be a holder in due course, but recent cases and statutory provisions undertake to provide similar protection to purchasers of chattel leases and other instruments which are frequently acquired by financial institutions. See § 400.2A–208; 400.9–206, RSMo 1986. This latter section refers expressly to "defenses of a type which may be asserted against a holder in due course under … (article 3.)."

Section 400.3–302, RSMo 1993 Supp. lists the requirements for "holder in due course." Subsection (a)(2) of that section requires that a holder in due course must take the instrument "(iii) without notice that the instrument is overdue or has been dishonored...." Doss admitted that the EPIC lease was listed in a document furnished to him of leases which were "nonperforming," that he was aware of the correspondence between EPIC and Boatmen's, and that he knew that the copiers were no longer in EPIC's possession. He was also aware of EPIC's legal position, and acquired the lease in spite of this knowledge. His admissions are inconsistent with status as a holder in due course. He has, therefore, only such rights as Boatmen's had at the time of the assignment.

There may also be a question under subsection (c)(ii), which precludes the status of holder in due course if an instrument is acquired "by purchase as a part of a bulk transaction not in the ordinary course of business of the transferor...." Doss purchased 129 leases from Boatmen's, without evaluation of the particular leases. The record may not demonstrate what the ordinary course of business is.

 Doss also argues that Boatmen's was a holder in due course at the time it acquired the EPIC lease, and that he is entitled to the rights of a successor to a holder in due course under the "shelter rule." It has long been recognized that the rights of a holder in due course could be substantially diluted if an obligor could impede negotiation by notifying prospective purchasers of defenses valid between the initial parties but not against the holder in due course. If it is determined that Boatmen's agreed to the cancellation of the lease, or waived its rights under the lease, then whatever rights it had as a holder in due course would no longer be effective. The shelter rule, designed to protect the holder and not the assignee, would no longer apply.

 Doss finally argues that his rights are protected by the "hell or high water" clause, so that he would not be bound by any agreement or waiver on the part of Boatmen's which would preclude its asserting further rights under the lease. Clauses of this type have generally received judicial protection. No Missouri cases have been located, but it seems probable that the Supreme Court of Missouri would be persuaded that

the clauses serve a useful purpose in commercial transactions, and would follow prevailing case law. If the clause has no effect other than to give the assignee rights comparable to those of the holder in due course of a negotiable instrument, then Doss's contention has been covered by our previous discussion. We believe that the clause connotes an agreement not known to be in default and that, in any event, it would not protect the assignee of a lease when the assignee knows that the lessee is no longer in possession of the property. Nor could Doss rely on the hell or high water clause if the underlying lease was in fact terminated as between the parties prior to the assignment, and he knew the facts relied on to demonstrate termination. The concept of holder in due course and its extensions exist to protect parties to commercial transactions. We sense no purpose of affording extraordinary protection to one who knowingly purchases a lawsuit.

Doss cites *Nat'l Bank of No. Am. v. De-Luxe Poster Co., Inc.,* 51 A.D.2d 582, 378 N.Y.S.2d 462 (1976). The court recognized the value of "hell or high water clauses," citing the New York Uniform Commercial Code, which seems similar to Missouri's, and said that the purpose of the statute was to permit parties to lease agreements to afford assignees the rights of holders in due course of negotiable instruments. The court held that summary judgment was not appropriate, because the plaintiff had not demonstrated in its affidavits that it took the assignment in good faith and without knowledge of any claim or defense. The case supports the conclusions of this opinion rather than supporting Doss's contention.

Doss also cites the opinion of Judge, now Justice, Breyer in *Union Mut. Life Ins. Co. v. Chrysler Corp.,* 793 F.2d 1 (1st Cir.1986). There the defending lessee sought to establish the untenable proposition that a lessor, by accepting rent from a sublessee, thereby agreed to discharge the original lessee. The case does not help Doss here.

By Doss's argument, the bare signing of a piece of paper containing the hell and high water clause would bind the signer, even at the suit of an assignee who acquires the instrument with full knowledge of possibly meritorious defenses. This is not a reasonable construction of the instrument, or of the underlying statute.

We conclude, therefore, that Doss was not entitled to the rights of a holder in due course, or to any analogous rights, and that he stands firmly in Boatmen's shoes.

### Conclusion

The record does not demonstrate the absence of genuine issues of material fact. The court, therefore, erred in entering summary judgment. We do not comment on issues not briefed and resist the temptation to provide a road map for the action in the trial court, because we do not have a full record.

The judgment is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

*REVERSED AND REMANDED.*

All concur.