MONSANTO COMPANY, Respondent,

v.

GARST SEED COMPANY f/k/a
Advanta USA, Inc.,
Appellant.

No. ED 89251.

Missouri Court of Appeals,
Eastern District,
Division Three.

Dec. 18, 2007.

Gerard T. Carmody, Erwin O. Switzer, Jeffrey L. Wax, Clayton, MO, for Appellant.

Joseph P. Conran, Mark G. Arnold, Greg G. Gutzler, Steven M. Berezney, Saint Louis, Mo, for Respondent.

## OPINION

GLENN A. NORTON, Judge.

Garst Seed Company f/k/a Advanta USA, Inc. ("Garst") appeals from the grant of summary judgment in favor of Monsanto Company ("Monsanto") on Monsanto's claim for declaratory judgment and on Garst's three counterclaims for breach of contract. We reverse and remand.

## I. BACKGROUND

### A. Relevant Facts and Issues

The relevant facts and issues in this case concern the amount of seed services fees Monsanto owes to Garst under a soybean license and seed services agreement ("the License Agreement"), the License Agreement's corresponding amendment ("the Amendment"),[1] and letters related to Garst's sale, during Fiscal Year 2004[2] and Fiscal Year 2005,[3] of soybean seed containing patented technology licensed from Monsanto to Garst.

### 1. The License Agreement

In 2001, Monsanto and Garst executed the License Agreement,[4] effective from September 1, 2001 until December 31, 2012, under which Monsanto licensed its patented Roundup Ready seed technology to Garst. Under the License Agreement, Monsanto agreed to pay a seed services fee to Garst, provided that Garst completed certain services when selling seed containing Monsanto's technology. Sales of this seed would generate royalties to Monsanto. The seed services fee under the License Agreement was a percentage of the royalty Garst remitted to Monsanto and the royalty was capped at a particular dollar amount.[5] The services Garst was required to perform under the License Agreement included promoting, marketing, producing, and delivering licensed seed.

The License Agreement defines "Seed Services Fee" as "the fee to be paid to

---

1. Monsanto and Garst are also parties to three corn license and seed service agreements that are part of this case. Each of the corn license agreements has a corresponding amendment. The relevant language in the three corn license agreements and their amendments is identical to the language in the License Agreement and the Amendment. For purposes of this appeal and for simplicity, we will conduct one general analysis under the License Agreement and the Amendment, as Monsanto did in its brief.

2. Under the License Agreement's definition of "Fiscal Year," Fiscal Year 2004 means a twelve-month period from September 1, 2003 until August 31, 2004.

3. Similarly, under the License Agreement's definition of "Fiscal Year," Fiscal Year 2005 means a twelve-month period from September 1, 2004 until August 31, 2005.

4. The parties also executed a License Incentive Agreement at this time. Except as otherwise noted, the specifics of this agreement are not relevant to the issues on appeal. ·

5. The License Incentive Agreement provided for a higher percentage of the royalty Garst remitted to Monsanto. This royalty was capped. For purposes of this appeal and for simplicity, all further references to the License Agreement incorporate these relevant terms of the License Incentive Agreement.

[Garst] under Subsection 4.01 and described in Exhibit G. . . ." Subsection 4.01 requires Monsanto to pay Garst the seed services fee "as set forth in Exhibit G" for each sale for which a royalty is "collected and remitted." Under Exhibit G, "in order to qualify" for a seed services fee, Garst shall submit accurate and timely sales reports, remit accurate and timely payment of royalties, and submit accurate and timely purchase reports. Subsection 4.03 provides that at or after the conclusion of each fiscal year, Garst was obligated to submit to Monsanto a final sales report and remit all royalties for the immediately preceding fiscal year.

## 2. The Amendment

In 2001, Garst and Monsanto also executed the Amendment, effective for the first four fiscal years of the License Agreement, or Fiscal Year 2001 through Fiscal Year 2004. The financial terms under the Amendment were more beneficial to Garst than the financial terms under the License Agreement: (1) the seed services fee was set at a higher percentage of the royalty Garst remitted to Monsanto; and (2) the royalty was uncapped. In order for Garst to qualify for the amended financial terms, Garst's sales had to meet certain Monsanto "loyalty" incentives.

Paragraph (2)(c) of the Amendment states in relevant part: "The financial terms set forth in attached Table 1 shall supercede and replace the financial terms of [the License Agreement] for Fiscal Years 2001, 2002, 2003 and 2004 unless terminated sooner. . . ." Paragraph (2)(d), the change of control provision, provides in pertinent part: "In the event of any change in control of [Garst], the financial terms set forth in this paragraph 3[sic] shall immediately and automatically expire and the original financial terms of the [License Agreement] shall then become immediately effective." The Amendment specifies that the amended financial terms are subject to all other provisions of the License Agreement.

## 3. The Royalty Notification Letters

On June 27, 2003, Monsanto sent Garst a letter that officially notified Garst of the royalty amount for Fiscal Year 2004 ("Royalty Notification Letter for FY2004"). The Royalty Notification Letter for FY2004 describes an opportunity for seed companies to earn seed services fee rates that were better than the rates available to Garst under the License Agreement, but were not as good as the rates available to Garst under the Amendment. On June 28, 2004, Monsanto sent Garst a similar letter that officially notified Garst of the royalty amount for Fiscal Year 2005 ("Royalty Notification Letter for FY2005"). The Royalty Notification Letter for FY2005 describes an opportunity for seed companies to earn seed services fee rates that were better than the rates available to Garst under the License Agreement. The rates under both letters were "designed to compensate . . . seed companies for additional reporting and collection requirements as well as reward those for performing activities beneficial to the stewardship, performance, and satisfaction of the Roundup Ready [systems]." The letters specify that the seed company could earn payment by performing certain activities: (1) complying with Exhibit G of the License Agreement; (2) complying with the terms set forth in the License Incentive Agreement; and (3) performing seed piracy and/or seamless pricing activities.

## 4. Fiscal Year 2004 and Fiscal Year 2005

It is undisputed that during Fiscal Year 2004, specifically from September 1, 2003 until August 31, 2004, Garst was operating under both the License Agreement and the

Amendment. It is also undisputed that Garst's Fiscal Year 2004 sales met the Amendment's "loyalty" incentives. The parties agree that on September 1, 2004, Garst underwent a change in control as defined by Paragraph 2(d) of the Amendment when Syngenta Seed Company purchased a majority stake in one of Garst's parent companies. The parties also agree that, as of September 1, 2004, Garst had not yet submitted its final sales report for seed sold in Fiscal Year 2004 or remitted payment for all of the royalties owed to Monsanto.

After Monsanto had received the full royalty payment from Garst for sales during Fiscal Year 2004, Monsanto paid Garst the seed services fee for Fiscal Year 2004, calculated at the rate provided for in the License Agreement, rather than the rate provided for under the Amendment or the rate described in the Royalty Notification Letter for FY2004. After the conclusion of Fiscal Year 2005, Monsanto paid Garst the seed services fee for sales during Fiscal Year 2005 according to the rate provided for in the License Agreement rather than the rate described in the Royalty Notification Letter for FY2005.

## B. Procedural Posture

In November 2004, Monsanto filed a petition for declaratory judgment, seeking a declaration that the terms of the License Agreement applied to the calculation of the seed services fee for Fiscal Year 2004, and that Monsanto's payment to Garst represented payment in full of its contractual obligations. Garst answered and asserted three counterclaims for breach of contract, alleging that: (1) the financial terms under the Amendment governed the seed services fee rate for Fiscal Year 2004, and

Monsanto breached the Amendment and License Agreement by failing to pay Garst accordingly (Count I); or (2) in the alternative, the terms described in the Royalty Notification Letter for FY2004 governed the seed services fee rate for Fiscal Year 2004 because the letter constituted a unilateral offer for an increased promotional seed services fee that Garst accepted by performance, and Monsanto breached the unilateral contract by failing to pay Garst accordingly (Count II); and (3) the Royalty Notification Letter for FY2005 governed the seed services fee for Fiscal Year 2005 because the letter constituted a unilateral offer for an increased promotional seed services fee that Garst accepted by performance, and Monsanto breached the unilateral contract by failing to pay Garst accordingly (Count III).[6] Thereafter, both parties filed motions for summary judgment on Monsanto's petition for declaratory judgment and on Garst's three breach of contract counterclaims.

After several interlocutory orders, the trial court granted summary judgment in favor of Monsanto on Monsanto's claim for declaratory judgment and on Garst's three counterclaims for breach of contract. Regarding Monsanto's claim for declaratory judgment and Count I, Garst's breach of contract counterclaim with respect to the License Agreement and the Amendment, the trial court found that the financial terms of the License Agreement applied to the calculation of the seed service fee for Fiscal Year 2004. The court reasoned that payments of all royalties and submissions of a final report were conditions precedent for payment of the seed services fee under the License Agreement, and by the time Garst completed those conditions precedent, the enhanced financial terms of

---

**6.** Garst originally pled Count III as a declaratory judgment claim but later amended it to be a breach of contract claim.

the Amendment had immediately and automatically expired under the change of control provision. Regarding Counts II and III, Garst's breach of contract counterclaims with respect to the royalty notification letters, the court found that the financial terms of the License Agreement, rather than the terms discussed in the Royalty Notification Letter for FY2004 or the Royalty Notification Letter for FY2005, applied for Fiscal Year 2004 and Fiscal Year 2005. The court found that the royalty notification letters were not offers to Garst, specifically because Garst had no reasonable basis for believing that the letters were offers that it could accept.

Thereafter, Monsanto filed a motion for attorney's fees, costs, and expenses pursuant to an attorney's fees provision in the License Agreement. The trial court then awarded Monsanto $195,449.63 in attorney's fees and $22,379.61 in costs and expenses because Monsanto had prevailed on Monsanto's claim for declaratory judgment and on Garst's three breach of contract counterclaims. Garst appeals.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is reviewed essentially *de novo* and affirmed only where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). We review the record in the light most favorable to the party against whom judgment was entered. *Id.*

### B. Garst's Breach of Contract Counterclaim With Respect to the License Agreement and the Amendment (Count I)

In its first point on appeal, Garst argues that the trial court erred in granting sum-mary judgment in favor of Monsanto on its breach of contract counterclaim with respect to the License Agreement and the Amendment (Count I). Garst asserts that the Amendment unambiguously provides that the Amendment's enhanced financial terms govern the calculation of the seed services fee for Fiscal Year 2004. In response, Monsanto contends that the Amendment and License Agreement unambiguously state that the License Agreement's original financial terms govern the calculation of the seed services fee for Fiscal Year 2004. As discussed below, we disagree with both parties because the language in the Amendment and the License Agreement is ambiguous as to what is the relevant time period for the calculation of the seed services fee for Fiscal Year 2004. Accordingly, the language of the Amendment and License Agreement is also ambiguous with respect to whether the enhanced financial terms or the original financial terms apply for Fiscal Year 2004.

### 1. Applicable Law

■■■ A license agreement is a contract governed by the general principles of contract law. *Monsanto Co. v. Syngenta Seeds, Inc.*, 226 S.W.3d 227, 230–31 (Mo. App. E.D.2007). The interpretation of a contract is a question of law, which our Court reviews *de novo*. *Id.* at 231. The cardinal rule of contract interpretation is to determine the intent of the parties and give effect to that intent. *Burrus v. HBE Corp.*, 211 S.W.3d 613, 616–17 (Mo.App. E.D.2006), *quoting J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. banc 1973).

■■■ Summary judgment is appropriate in a breach of contract action where the language of the contract is "so clear and unambiguous that the meaning of the portion in dispute is so apparent that it

may be ascertained from the four corners of the document." *Board of Education of the City of St. Louis v. State,* 134 S.W.3d 689, 695 (Mo.App. E.D.2004). Where the contract is unambiguous, a court will ascertain the intent of the parties from the contract alone and will not resort to construction. *Burrus,* 211 S.W.3d at 617.

■■■ Where an ambiguity exists, however, summary judgment is improper because a question of fact exists regarding the intent of the parties. *Id.* at 619. If the contract is ambiguous, the parties' intent must be ascertained at trial using parol or extrinsic evidence. *See Board of Education,* 134 S.W.3d at 695.

■■■ The issue of whether a contract is ambiguous is a question of law. *Board of Education,* 134 S.W.3d at 695. A contract is ambiguous when we find that "it is reasonably susceptible to different constructions." *Burrus,* 211 S.W.3d at 617, *quoting J.E. Hathman,* 491 S.W.2d at 264. An ambiguity does not arise merely because the parties disagree as to the proper construction of the contract. *Board of Education,* 134 S.W.3d at 695.

### 2. Extrinsic Evidence

We initially note that Garst and Monsanto both attempt to use extrinsic evidence to explain the meaning of the Amendment and the License Agreement.

Specifically, Garst contends that evidence of the parties' prior dealings in Fiscal Year 2001 through Fiscal Year 2003 reveals that the applicable seed services fee rate was determined by the rate in effect during the fiscal year in which sales occurred, not the rate in effect when Garst made its post-fiscal year final sales report and royalty payment. Garst contends that this evidence is probative of when the seed services fee should be calculated in the instant case.

Monsanto maintains that Garst's conduct after the parties executed the Amendment should be construed against Garst. Monsanto asserts that because Garst proposed an amendment to the change of control provision that would support Garst's position on appeal, and because Monsanto rejected this amendment, the change of control provision as currently written prevents Garst from earning the enhanced seed service fee under the Amendment. Monsanto also contends that an e-mail written by Garst management before the change of control took place is evidence of the meaning of the change of control language. In support of its argument that this Court should consider this evidence of course of conduct, Monsanto cites *Phipps v. School District of Kansas City,* 645 S.W.2d 91 (Mo.App. W.D.1982), *Landau v. Laughren,* 357 S.W.2d 74 (Mo. 1962), and *Meredith Development Co. v. Bennett,* 444 S.W.2d 519 (Mo.App.1969).

Importantly, none of the cases cited by Monsanto involve an appeal from a grant of summary judgment. *See Board of Education,* 134 S.W.3d at 698 (declining to follow *Landau* in an appeal from a grant from summary judgment because *Landau* involved an appeal from a judgment entered in an action for accounting); *Phipps,* 645 S.W.2d at 93 (involving an appeal from an administrative decision); *Meredith,* 444 S.W.2d at 521 (involving an appeal from a bench trial). And as we have previously stated, if the language of the contract is unambiguous, we must look to the contract alone to determine the parties' intent. *Burrus,* 211 S.W.3d at 617. Furthermore, when a contract is ambiguous, and the parties' intent must be ascertained using parol or extrinsic evidence, a question of fact exists regarding the intent of the parties and summary judgment is erroneous. *Id.* at 619; *Board of Education,* 134 S.W.3d at 695. Thus, we will not consider evidence of prior dealings or course of

conduct in determining the parties' intent in this appeal from a grant of summary judgment. Rather, because the Amendment specifies that the amended financial terms are subject to all other provisions of the License Agreement, we must look solely at the terms of the Amendment and the terms of the License Agreement to determine whether the language unambiguously expresses that intent.

**3. The Terms of the Amendment and the Terms of the License Agreement**

Paragraph 2(d) of the Amendment, the change of control provision, provides: "In the event of any change in control of [Garst], the financial terms set forth in this paragraph 3[sic] shall immediately and automatically expire and the original financial terms of the [License Agreement] shall then become immediately effective." It is undisputed that on September 1, 2004, Garst underwent a change in control as defined by Paragraph 2(d) of the Amendment. While the plain language of Paragraph 2(d) provides that the amended financial terms immediately and automatically expired on September 1, 2004, and that the original financial terms of the License Agreement then became immediately effective, the parties disagree as to whether September 1, 2004 is part of the relevant time period for the calculation of the seed services fee for Fiscal Year 2004.

■ In arguing that the Amendment and License Agreement unambiguously provides for the amended financial terms to govern the calculation of the seed services fee for Fiscal Year 2004, Garst contends that September 1, 2004 is not part of the relevant time period for calculation of the seed services fee for Fiscal Year 2004. In support, Garst relies on Paragraph 2(c) of the Amendment, which states in relevant part: "The financial terms set forth in the attached Table 1 shall supercede and replace the financial terms of [the

License Agreement] for Fiscal Years 2001, 2002, 2003 and 2004 *unless terminated sooner ....*" (emphasis added). Under the License Agreement's definition of "Fiscal Year," Fiscal Year 2004 took place from September 1, 2003 until August 31, 2004. Thus, Garst argues that Paragraph 2(c) and the change of control provision should be construed to mean that the amended financial terms naturally expired at the end of Fiscal Year 2004, or on August 31, 2004, because they were not terminated sooner. Garst further contends that because the September 1, 2004 change of control did not take place until after this natural expiration, the amended financial terms apply to the calculation of the seed services fee for Fiscal Year 2004. We find this is one reasonable construction of the language of the Amendment and License Agreement.

In contending that the Amendment and the License Agreement unambiguously provide that the original financial terms, under the License Agreement, govern the calculation of the seed services fee for Fiscal Year 2004, Monsanto asserts that September 1, 2004 is part of the relevant time period for calculation of the seed services fee for Fiscal Year 2004. Monsanto relies on Subsection 4.01, Exhibit G, and Subsection 4.03 of the License Agreement.

Monsanto maintains that Garst never earned the amended financial terms because Garst's September 1, 2004 change in control caused the amended terms to immediately and automatically expire before Garst had satisfied all conditions necessary to earn the enhanced seed services fee. The License Agreement defines "Seed Services Fee" as "the fee to be paid to [Garst] under Subsection 4.01 and described in Exhibit G...." Subsection 4.01 requires Monsanto to pay Garst the seed services fee "as set forth in Exhibit G" for

each sale for which a royalty is "collected and remitted." Under Exhibit G, "in order to qualify" for any seed services fee, Garst shall submit accurate and timely sales reports, remit accurate and timely payment of royalties, and submit accurate and timely purchase reports. And, Subsection 4.03 provides that at or after the conclusion of each fiscal year, Garst was obligated to submit to Monsanto a final sales report and remit all royalties for the immediately preceding fiscal year. It is undisputed that as of Garst's change of control on September 1, 2004, Garst had not yet submitted its final sales report for seed sold in Fiscal Year 2004, or remitted all of the royalties owed to Monsanto. Monsanto contends that the License Agreement and Amendment should be construed to mean that Garst must "qualify" for the seed service fee, i.e., submit accurate and timely sales reports, remit accurate and timely payment of royalties, and submit accurate and timely purchase reports, before the amended financial terms apply. Monsanto further asserts that because Garst did not "qualify" for the seed services fee before Garst's change of control occurred, the original financial terms under the License Agreement apply, rather than the amended financial terms. We find this is also a reasonable construction of the language of the Amendment and License Agreement.

Further, we also find that neither the Amendment nor the License Agreement unambiguously expresses the parties' intent as to the relevant time period for calculation of the seed services fee for Fiscal Year 2004. Rather, the language of the Amendment and License Agreement is ambiguous because it is reasonably susceptible to different constructions. One reasonable construction, advanced by Garst under Paragraph 2(d) and Paragraph 2(c) of the Amendment, is that the calculation for the seed services fee depends solely on events taking place within Fiscal Year 2004 (September 1, 2003 until August 31, 2004). Under this construction, the amended financial terms apply for Fiscal Year 2004. Another reasonable construction, advanced by Monsanto under Subsection 4.01, Exhibit G, and Subsection 4.03 of the License Agreement, is that the calculation for the seed services fee depends on: (1) events taking place within Fiscal Year 2004; and (2) the time period in which Garst "qualifies" for the seed services fee by submitting accurate and timely sales reports, remitting accurate and timely payment of royalties, and submitting accurate and timely purchase reports. Under this construction, the original financial terms apply for Fiscal Year 2004. Because the language of the Amendment and License Agreement is ambiguous with respect to the relevant time period for the calculation of the seed services fee for Fiscal Year 2004, it follows that the language of the Amendment and License Agreement is also ambiguous as to whether the amended financial terms or the original financial terms apply for Fiscal Year 2004.

The trial court's grant of summary judgment in favor of Monsanto was erroneous because of the factual issue concerning the parties' intent as to the relevant time period for calculation of the seed services fee for Fiscal Year 2004. Because of the ambiguity concerning this critical language, on remand the trial court shall permit the parties to present parol and extrinsic evidence concerning the intent of the parties. *See Burrus,* 211 S.W.3d at 617, 619. The following specific factual question remains to be determined by a trier of fact: (1) whether the parties intended for the calculation of the seed services fee to depend solely on events taking place within Fiscal Year 2004 (September 1, 2003 until August 31, 2004) and thus the amended financial terms apply, or (2) in the alternative,

whether the parties intended for the calculation of the seed services fee to depend not only on events taking place within Fiscal Year 2004, but also the time period during which Garst "qualifies" for the seed services fee by submitting accurate and timely sales reports, remitting accurate and timely payment of royalties, and submitting accurate and timely purchase reports so that the original financial terms apply. Point one is granted.

## C. Garst's Breach of Contract Counterclaims With Respect to the Royalty Notification Letters (Counts II and III)

In its second point on appeal, Garst contends that the trial court erred in granting summary judgment in favor of Monsanto on Counts II and III, Garst's breach of contract counterclaims with respect to the royalty notification letters. Although the following discussions involving Counts II and III are, in many respects, factually similar, there are important distinctions between the two counts.

In Count II, Garst alleged that the terms described in the Royalty Notification Letter for FY2004 governed the seed services fee rate for Fiscal Year 2004 because the letter constituted a unilateral offer for an increased promotional seed services fee that Garst accepted by performance, and Monsanto breached the unilateral contract by failing to pay Garst accordingly. In Count III, Garst asserted that the Royalty Notification Letter for FY2005 governed the seed services fee for Fiscal Year 2005 because the letter constituted a unilateral offer for an increased promotional seed services fee that Garst accepted by performance, and Monsanto breached the unilateral contract by failing to pay Garst accordingly. In entering summary judgment for Monsanto on Counts II and III, the court found that the royalty

notification letters were not offers to Garst, and specifically found that Garst had no reasonable basis for believing that the letters were offers that it could accept.

■■■ Where the movant for summary judgment is a defendant, as Monsanto is under Counts II and III, summary judgment may be proper where the defendant shows that undisputed facts negate any one element of a cause of action. *See Jones v. St. Charles County,* 181 S.W.3d 197, 200 (Mo.App. E.D.2005). Missouri Approved Instruction ("MAI") 26.01 sets out the required elements for a breach of unilateral contract claim. MAI—Civil 6th 26.01; *Cf. Gramex Corp. v. Green Supply, Inc.,* 89 S.W.3d 432, 441 (Mo. banc 2002) (stating that MAI 25.04 sets out the required elements for a products liability claim). Analyzing the summary judgment decision in this case under the elements set forth in MAI 26.01 is appropriate because Garst has no higher standard to survive summary judgment than is required to submit the claim to a fact finder. *Cf. Daugherty v. City of Maryland Heights,* 231 S.W.3d 814, 820 (Mo. banc 2007) (holding that analyzing summary judgment decisions under the standards set forth in MAI 31.24 is appropriate because a plaintiff has no higher standard to survive summary judgment than is required to submit the claim to a jury). MAI 26.01, the verdict director for a breach of unilateral contract claim, provides in pertinent part:

> Your verdict must be for plaintiff if you believe:
>
> First, defendant offered to (*set out essential terms of offer*) if plaintiff would (*set out terms of plaintiff's performance*), and
>
> Second, plaintiff performed the act[s] called for in such with intent to accept such offer, and

Third, defendant knew of such performance, and

Fourth, defendant thereafter did not perform what he had so offered, and

Fifth, plaintiff was thereby damaged.[7]

 A unilateral offer is an offer that calls for acceptance by an act rather than by a communication. *Doss v. EPIC Healthcare Management Co.*, 901 S.W.2d 216, 220 (Mo.App. S.D.1995). Both parties agree that the following definition of "offer" is important to the resolution of this appeal: "An act that leads the offeree reasonably to believe that a power to create a contract is conferred upon him ... creates a power of acceptance and is therefore an offer...." *Coffman Industries, Inc. v. Gorman–Taber Co.*, 521 S.W.2d 763, 769 (Mo.App.1975), *quoting 1 Corbin on Contracts* section 11 (1952).

## 1. The Royalty Notification Letter for FY2004 (Count II)

In its first sub-point to Point II on appeal, Garst contends that, under Count II, its breach of contract counterclaim with respect to the Royalty Notification Letter for FY2004, there are genuine issues of material fact as to whether the letter met the definition of an "offer" under *Coffman*, i.e., whether the letter was an act that led Garst reasonably to believe that a power to create a contract was conferred upon it. *See* 521 S.W.2d at 769. Monsanto counters that the trial court properly entered summary judgment in its favor because the facts are undisputed on that issue. Monsanto also contends that, assuming that the Royalty Notification Letter for FY2004 did constitute an offer, the undisputed facts show that Garst failed to per-

form the acts called for in the letter with the intent to accept it.

On June 27, 2003, Monsanto sent Garst the Royalty Notification Letter for FY2004. The letter officially notified Garst of the royalty amount for Fiscal Year 2004, which Monsanto was required to do pursuant to Subsection 4.02(b) of the License Agreement. The letter also describes an opportunity for seed companies to earn seed services fee rates that were better than rates available to Garst under the License Agreement, but were not as good as the rates available to Garst under the Amendment. According to the letter, the rates were "designed to compensate the seed companies for additional reporting and collection requirements as well as reward those for performing activities beneficial to the stewardship, performance, and satisfaction of the Roundup Ready Soybean system." The letter specifies that the seed company could earn payment by performing certain activities: (1) complying with Exhibit G of the License Agreement; (2) complying with the terms set forth in the License Incentive Agreement; and (3) performing seed piracy and seamless pricing activities.

### a. Genuine Issues of Material Fact as to Whether the Royalty Notification Letter for FY2004 Was an Offer

 As discussed below, we find that it could be reasonable for a trier of fact to believe from the evidence that, under *Coffman*, the Royalty Notification Letter for FY2004 was an act that led Garst reasonably to believe that a power to create a contract was conferred upon it and therefore was an offer. Because we also find that it could be reasonable for a trier of fact to believe from the evidence that the Royalty Notification Letter FY2004 was

---

**7.** If this matter is ultimately submitted to a jury, we note that the 1980 Revision to MAI 26.01 includes an additional provision if an affirmative defense is submitted.

not an act that led Garst reasonably to believe that a power to create a contract was conferred upon it and was therefore not an offer, there are genuine issues of material fact as to whether the Royalty Notification Letter for FY2004 was an offer.

### i. Evidence That Letter Was an Offer

In a deposition, William Witherspoon, Jr., Garst's President, testified on behalf of Garst that it understood, based on conversations with Monsanto, that if Garst reverted back to the terms of License Agreement due to a change in control, it would get paid according to the financial terms of the License Agreement plus any marketing programs presented to Garst. This testimony was made in the context of Witherspoon's statements about Garst's performance of the activities discussed in the Royalty Notification Letter for FY2004. Viewing the record in the light most favorable to Garst, a reasonable inference is that the marketing programs to which Witherspoon referred included the Royalty Notification Letter for FY2004. There is also evidence in the record showing that although Garst was already obligated to perform two of the activities in the letter (complying with Exhibit G and complying with the terms set forth in the License Incentive Agreement), Garst was not obligated to perform seed piracy and seamless pricing activities under the License Agreement. We find that it could be reasonable for a trier of fact to believe from the above evidence that, under *Coffman*, the Royalty Notification Letter for FY2004 was an act that led Garst reasonably to believe that a power to create a contract was conferred upon it and therefore was an offer.

### ii. Evidence That Letter Was Not an Offer

Nonetheless, we also find that it could be reasonable for a trier of fact to believe that, under *Coffman*, the Royalty Notification Letter for FY2004 was not an act that led Garst reasonably to believe that a power to create a contract was conferred upon it and therefore was not an offer. During Fiscal Year 2004, it is undisputed that Garst was operating under both the License Agreement and the Amendment. The Royalty Notification Letter for FY2004 states in relevant part that: "Monsanto has *increased the Seed Services Fee opportunity your seed company can earn* from qualifying unit sales of Roundup Ready Soybeans for 2004." (emphasis added). The Royalty Notification Letter for FY2004 described an opportunity for seed companies to earn seed services fee rates not as high as the rates available to Garst under the Amendment. Thus, the seed services fee rate described in this letter was not an "increased" fee "opportunity" compared to the seed services fee rate Garst was potentially eligible for in Fiscal Year 2004 under the Amendment.

As previously stated at the outset of subsection 1(a), we find that the above evidence creates genuine issues of material fact as to whether the Royalty Notification Letter for FY2004 was an act that led Garst reasonably to believe that a power to create a contract was conferred upon it and was therefore an offer.

### b. Genuine Issues of Material Fact as to Whether Garst Performed the Acts Called for in the Letter with the Intent to Accept

Assuming *arguendo*, and for purposes of appeal, that the Royalty Notification Letter for FY2004 did constitute an offer, there are genuine issues of material fact as to whether Garst performed the acts called for in the letter with the intent to accept it. There is evidence that Garst performed all

of the acts called for in the Royalty Notification Letter for FY2004: (1) it complied with Exhibit G of the License Agreement; (2) it complied with the terms set forth in the License Incentive Agreement; and (3) it performed seed piracy and seamless pricing activities.[8] Nevertheless, there are issues of fact as to whether Garst performed the acts *with the intent to accept* the letter as an offer. Witherspoon testified in his deposition that Garst took action, including performing seed piracy and seamless pricing activities, in response to receiving the Royalty Notification Letter for FY2004. Monsanto alleges in its brief that Witherspoon later contradicted his own testimony, stating the motive to take action was not the letter but a conversation with Monsanto officials indicating that after the Amendment expired, Monsanto and Garst's agreement would revert to the industry standard, i.e., the terms of the License Agreement plus any marketing offers that were presented. Recognizing that "[e]specially when unilateral contracts are involved, there may be a question of fact as to whether particular conduct is intended as an acceptance," we find that Witherspoon's conflicting testimony creates genuine issues of material fact as to whether Garst performed the acts called for in the letter with the intent to accept it as an offer. *See Doss*, 901 S.W.2d at 220.

#### c. Conclusion as to the Royalty Notification Letter for FY2004 (Count II)

We find the trial court erred in granting summary judgment in favor of Monsanto on Count II, Garst's breach of contract counterclaim with respect to the Royalty Notification Letter for FY2004, because there are genuine issues of material fact as

to whether, under *Coffman*, the letter was an offer, and, if it did constitute an offer, whether Garst performed the acts called for in the letter with the intent to accept it. Sub-point one to Point II on appeal is granted.

#### 2. The Royalty Notification Letter for FY2005 (Count III)

In its second sub-point to Point II on appeal, Garst contends that, under Count III, its breach of contract counterclaim with respect to the Royalty Notification Letter for FY2005, there are genuine issues of material fact as to whether the letter met the definition of an "offer" under *Coffman*, i.e., whether the letter was an act that led Garst reasonably to believe that a power to create a contract was conferred upon it. *See* 521 S.W.2d at 769. Monsanto counters that the trial court properly entered summary judgment in its favor because the facts are undisputed on that issue. Monsanto also contends that, assuming that the Royalty Notification Letter for FY2005 did constitute an offer, the undisputed facts show that Garst failed to perform the acts called for in the letter with the intent to accept it.

On June 28, 2004, Monsanto sent Garst the Royalty Notification Letter for FY2005. The letter officially notified Garst of the royalty amount for Fiscal Year 2005, which Monsanto was required to do pursuant to Subsection 4.02(b) of the License Agreement. As with the Royalty Notification Letter for FY2004, the letter also describes an opportunity for seed companies to earn seed services fee rates that were better than rates available to Garst under the License Agreement. According to the letter, the rates were "de-

---

8. While it is clear from the record that Monsanto admits that Garst performed seed piracy and seamless pricing activities in Fiscal Year 2004, it is unclear whether Monsanto admits that Garst complied with Exhibit G of the License Agreement and complied with the terms set forth in the License Incentive Agreement.

signed to compensate seed companies for additional reporting and collection requirements as well as reward those for performing activities beneficial to the stewardship, performance, and satisfaction of Roundup Ready systems." The letter specifies that the seed company could earn payment by performing certain activities: (1) complying with Exhibit G of the License Agreement; (2) performing stewardship and seamless pricing activities; and (3) complying with the terms set forth in the License Incentive Agreement.

### a. Genuine Issues of Material Fact as to Whether the Royalty Notification Letter for FY2005 Was an Offer

██ As discussed below, we find that it could be reasonable for a trier of fact to believe from the evidence that, under *Coffman*, the Royalty Notification Letter for FY2005 was an act that led Garst reasonably to believe that a power to create a contract was conferred upon it and therefore was an offer. Because we also find that it could be reasonable for a trier of fact to believe from the evidence that the Royalty Notification Letter FY2005 was not an act that led Garst reasonably to believe that a power to create a contract was conferred upon it and was therefore not an offer, there are genuine issues of material fact as to whether the Royalty Notification Letter for FY2005 was an offer.

### i. Evidence That Letter Was an Offer

Delbert Harper, the Director of Technology for Monsanto who signed the letter, testified in his deposition that Garst would be excluded from additional offers "as long as they had the [enhanced terms]" under the Amendment. Garst was not operating under the terms of the Amendment in Fiscal Year 2005 because the Amendment was only effective from Fiscal Year 2001 through Fiscal Year 2004. Additionally, there is also evidence in the record showing that although Garst was already obligated to perform two of the activities in the letter (complying with Exhibit G and complying with the terms set forth in the License Incentive Agreement), Garst was not obligated to perform seamless pricing activities under the License Agreement. Furthermore, Witherspoon stated in his affidavit that no one from Monsanto told him that Garst was ineligible for the opportunity described in the letter. We find that it could be reasonable for a trier of fact to believe from the above evidence that, under *Coffman*, the Royalty Notification Letter for FY2005 was an act that led Garst reasonably to believe that a power to create a contract was conferred upon it and therefore was an offer.

### ii. Evidence That Letter Was Not an Offer

On the other hand, we also find that it could be reasonable for a trier of fact to believe that, under *Coffman*, the Royalty Notification Letter for FY2005 was not an act that led Garst reasonably to believe that a power to create a contract was conferred upon it and therefore was not an offer. Monsanto sent the Royalty Notification Letter for FY2005 after Monsanto became aware of Garst's sale to Syngenta. And, Witherspoon acknowledged in an e-mail that "Monsanto has never given in to anything that would be beneficial to Syngenta" and that Monsanto "hate[s] Syngenta."

As previously stated at the outset of subsection 2(a), we find that the above evidence creates genuine issues of material fact as to whether the Royalty Notification Letter for FY2005 was an act that led Garst reasonably to believe that a power to create a contract was conferred upon it and was therefore an offer.

**b. Genuine Issues of Material Fact as to Whether Garst Performed the Acts Called for in the Letter with the Intent to Accept**

Assuming *arguendo*, and for purposes of appeal, that the Royalty Notification Letter for FY2005 did constitute an offer, there are genuine issues of material fact as to whether Garst performed the acts called for in the letter with the intent to accept it. There is evidence that Garst performed all of the acts called for in the Royalty Notification Letter for FY2005: (1) it complied with Exhibit G of the License Agreement; (2) it performed stewardship and seamless pricing activities; and (3) it complied with the terms in the License Incentive Agreement.[9] Nonetheless, there are issues of fact as to whether Garst performed the acts *with the intent to accept* the letter as an offer. Witherspoon testified in his deposition that Garst took action, including performing seamless pricing activities, in response to receiving the Royalty Notification Letter for FY2005. Monsanto alleges in its brief that Witherspoon earlier contradicted his own testimony, stating the motive to take action was not the letter but a conversation with Monsanto officials indicating that after the Amendment expired, Monsanto and Garst's agreement would revert to the industry standard, i.e., the terms of the License Agreement plus any marketing program offers that were presented. Recognizing that "[e]specially when unilateral contracts are involved, there may be a question of fact as to whether particular conduct is intended as an acceptance," we find that Witherspoon's conflicting testimony creates genuine issues of material fact as to whether Garst performed the acts called for in the letter

with the intent to accept it as an offer. *See Doss,* 901 S.W.2d at 220.

**c. Conclusion as to the Royalty Notification Letter for FY2005 (Count III)**

We find the trial court erred in granting summary judgment in favor of Monsanto on Count III, Garst's breach of contract counterclaim with respect to the Royalty Notification Letter for FY2005, because there are genuine issues of material fact as to whether, under *Coffman,* the letter was an offer, and, if it did constitute an offer, whether Garst performed the acts called for in the letter with the intent to accept it. Sub-point two to Point II on appeal is granted.

**D. Monsanto's Claim for Declaratory Judgment**

In Garst's third point on appeal, Garst contends that the trial court erred in granting summary judgment in favor of Monsanto on Monsanto's claim for declaratory judgment because Monsanto had an adequate remedy at law. Garst asserts that Monsanto had an adequate remedy at law because Monsanto could defend its claim, and because Monsanto did, in fact, defend its claim on summary judgment when Monsanto defended against Garst's breach of contract counterclaim with respect to the License Agreement and the Amendment (Count I) and against Garst's breach of contract counterclaim with respect to the Royalty Notification Letter for FY2004 (Count II).

**1. Substantive Similarity Between Monsanto's Declaratory Judgment Claim and Two of Garst's Breach of**

---

9. While it is clear from the record that Monsanto admits that Garst performed seamless pricing activities in Fiscal Year 2005, it is unclear whether Monsanto admits that Garst complied with Exhibit G of the License Agreement and complied with the terms set forth in the License Incentive Agreement.

**Contract Counterclaims (Counts I and II)**

Monsanto's petition for declaratory judgment sought a declaration that its Fiscal Year 2004 payment to Garst, which was based upon the original financial terms under the License Agreement, represented payment in full of its contractual obligations. In other words, Monsanto essentially requested the court to declare that it had not breached agreements with Garst by paying the seed services fee rate described under the License Agreement for Fiscal Year 2004. Count I, Garst's breach of contract counterclaim with respect to the License Agreement and the Amendment, alleged that the financial terms of the Amendment applied to Monsanto's payment for Fiscal Year 2004. Garst alternatively asserted in Count II, its breach of contract counterclaim with respect to the Royalty Notification Letter for FY2004, that the financial terms described in the letter applied to Monsanto's payment for Fiscal Year 2004. Thus, Monsanto's declaratory judgment claim and two of Garst's breach of contract counterclaims (Counts I and II) all involve essentially the same substantive issues: the amount of money Monsanto is contractually obligated to pay Garst for Fiscal Year 2004.

**2. Reversal of Monsanto's Declaratory Judgment Claim**

In Section B and C(1), we found that Garst's breach of contract counterclaims (Counts I and II) must be reversed and remanded because genuine issues of material fact exist that must be determined by a trier of fact. Because of the substantive similarity between Count I, Count II, and Monsanto's declaratory judgment claim, it follows that Monsanto's declaratory judgment claim also involves genuine issues of material fact. Consequently, we reverse the trial court's grant of summary judgment on Monsanto's declaratory judgment claim.

**3. Monsanto's Declaratory Judgment Claim on Remand**

We now turn to how the trial court should proceed on Monsanto's declaratory judgment claim on remand. Because the substantive nature of the genuine issues of material fact in Monsanto's declaratory judgment claim are essentially the same as the substantive nature of the genuine issues of material fact in two of Garst's breach of contract counterclaims (Counts I and II), on remand Monsanto can assert the issues sought to be declared in its declaratory judgment claim in defense of Counts I and II. As a result, Monsanto has an adequate remedy at law and it cannot maintain its declaratory judgment action on remand. *See Preferred Physicians Mutual Management Group, Inc. v. Preferred Physicians Mutual Risk Retention Group,* 916 S.W.2d 821, 824 (Mo.App. W.D.1995) (holding that "an adequate remedy exists if the plaintiff could assert the issues sought to be declared as a defense in an action brought by the defendant"); *Moschenross v. St. Louis County,* 188 S.W.3d 13, 22 (Mo.App. E.D. 2006) (finding that in order for a party to maintain a declaratory judgment action, it must demonstrate a justiciable controversy for which there is no adequate remedy at law).

**4. Conclusion as to Monsanto's Claim for Declaratory Judgment**

Therefore, we reverse and remand the trial court's grant of summary judgment on Monsanto's declaratory judgment claim. On remand, we instruct the trial court to dismiss Monsanto's claim. Point three is granted.

**E. Attorney's Fees, Expenses, and Costs on Appeal**

In its motion for attorney's fees, expenses, and costs on appeal, which is taken

with the case, Monsanto contends it is entitled to attorney's fees, expenses, and costs on appeal pursuant to an attorney's fees provision in the License Agreement. Ordinarily, under the "American rule," each litigant bears the expense of his own attorney's fees. *Sheppard v. East*, 192 S.W.3d 518, 523 (Mo.App. E.D.2006). One exception to the American rule is where a contract states that a prevailing party is entitled to recover attorney's fees. *Id.* To be a "prevailing party," the party must ultimately prevail on appeal. *St. Louis University v. Cantor*, 720 S.W.2d 382, 385 (Mo.App. E.D.1986). As discussed above, Monsanto does not ultimately prevail on appeal on any of Garst's three breach of contract counterclaims (Counts I, II, or III), or on Monsanto's claim for declaratory judgment. Therefore, we deny Monsanto's motion for attorney's fees, costs, and expenses on appeal.

### F. The Trial Court's Award of Attorney's Fees, Costs, and Expenses

Garst contends that the trial court erred in awarding Monsanto attorney's fees, costs, and expenses. We agree.

On the basis of an attorney's fees provision in the License Agreement, the trial court awarded Monsanto, the prevailing party on summary judgment, $195,449.63 in attorney's fees and $22,379.61 in costs and expenses for prevailing on Garst's three breach of contract counterclaims (Counts I, II, and III) and for prevailing on Monsanto's claim for declaratory judgment. As previously noted, in order for Monsanto to prevail, however, Monsanto must ultimately prevail on appeal. *See St. Louis University*, 720 S.W.2d at 385. Because Monsanto has not ultimately prevailed on any of Garst's three breach of contract counterclaims (Counts I, II, or III), or on Monsanto's declaratory judgment claim, we reverse the trial court's

judgment awarding Monsanto attorney's fees, costs, and expenses. *See id.* (reversing the trial court's award of attorney's fees and costs based on a contract provision because the plaintiff, the prevailing party at trial, did not ultimately prevail on appeal).

### III. CONCLUSION

We reverse the trial court's grant of summary judgment in favor of Monsanto on Garst's three breach of contract counterclaims (Counts I, II, and III), and the causes are remanded for further proceedings in accordance with this opinion. We reverse the trial court's grant of summary judgment in favor of Monsanto's claim for declaratory judgment and we instruct the trial court on remand to dismiss this claim. Finally, we deny Monsanto's motion for attorney's fees, costs, and expenses on appeal, and reverse the trial court's judgment awarding Monsanto attorney's fees, costs, and expenses.

ROY L. RICHTER, P.J. and CLIFFORD H. AHRENS, J., concur.